**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| David Elliot and Chris Gillespie, | No. CV-12-1072-PHX-SMM |
| Plaintiffs, | |
| v. | **MEMORANDUM OF DECISION AND ORDER** |
| Google Incorporated, | |
| Defendant. | |

Google Incorporated,

      Counter-Claimant,

v.

David Elliot and Chris Gillespie,

      Counter-Defendants,

Before the Court are Plaintiffs David Elliot's ("Elliot") and Chris Gillespie's ("Gillespie") (collectively "Plaintiffs") and Defendant Google Incorporated's ("Defendant") fully briefed cross-motions for summary judgment. (Docs. 67; 73; 83; 86; 111; 112.) For the reasons that follow, Plaintiffs' motion is denied and Defendant's motion is granted.[1]

/ / /

---

[1] The parties' requests for oral argument are denied because there was adequate opportunity to present written argument and oral argument will not aid the Court's decision. Fed. R. Civ. P. 78(b); LRCiv. 7.2(f); <u>Partridge v. Reich</u>, 141 F.3d 920, 926 (9th Cir. 1998).

**BACKGROUND**

The following facts are undisputed unless otherwise noted. This case concerns two United States registrations of the GOOGLE mark: Number 2884502 (the " '502 Mark") and Number 2806075 (the " '075 Mark"). The '502 Mark covers "computer hardware; computer software for creating indexes of information, indexes of web sites and indexes of other information resources." (Docs. 68 ¶ 18; 87 ¶ 18.) The '075 Mark covers, *inter alia*:

> Computer services, namely, providing software interfaces available over a network in order to create a personalized on-line information service; extraction and retrieval of information and data mining by means of global computer networks; creating indexes of information, indexes of web sites and indexes of other information sources in connection with global computer networks; providing information from searchable indexes and databases of information, including text, electronic documents, databases, graphics and audio visual information, by means of global computer information networks.

(Docs. 68 ¶ 19; 87 ¶ 19.) It is undisputed that the '502 and '075 GOOGLE marks refer to the eponymous search engine service provided by Defendant (the "Google search engine").

During a two-week period ending on March 10, 2012, Plaintiffs used a domain name registrar to acquire 763 domain names that combined the word "google" with another brand, *e.g.*, googledisney.com, a person, *e.g.*, googlebarackobama.net, a place, *e.g.*, googlemexicocity.com, or with some generic term, *e.g.*, googlenewtvs.com (the "Domain Names"). (Docs. 68 ¶ 22; 70-6 at 2-8; 87 ¶ 22.) Defendant promptly filed a complaint requesting transfer of the Domain Names pursuant to the Uniform Domain Name Dispute Resolution Policy ("UDRP") incorporated into the domain name registrar's Terms of Use. (Docs. 68 ¶¶ 25-27; 70-3 at 2.) Responding to Defendant's arbitration complaint, Gillespie asserted, *inter alia*, that the GOOGLE mark has become generic and that he should be permitted to use the Domain Names incorporating the GOOGLE mark in furtherance of his business plans.[2] (Docs. 68 ¶ 33; 87 ¶ 33.) The UDRP panel ordered the Domain Names be

---

[2] Gillespie also filed a petition with the U.S. Trademark Trial and Appeal Board ("TTAB") requesting cancellation of the '502 Mark and the '075 Mark contending that the GOOGLE mark has become generic. (Docs. 68 ¶¶ 28-29; 87 ¶¶ 28-29.) The TTAB proceedings have been stayed pending resolution of this case.

1   transferred to Defendant because: the Domain Names are confusingly similar to the GOOGLE

2   mark; Gillespie has no rights or legitimate interests in the Domain Names; and the Domain

3   Names were registered and used in bad faith.[3] (Docs. 68 ¶¶ 34-35; 87 ¶¶ 34-35.)

4   Elliot then instituted the present action by filing a complaint (Doc. 1), which was

5   amended to include Gillespie as a Plaintiff (Doc. 25), seeking cancellation of both the '502

6   and '075 marks and a declaration of the same. Defendant's answer alleged counterclaims for

7   trademark dilution, cybersquatting, and unjust enrichment under the Lanham Act, as well as

8   counterclaims for unfair competition and false advertising under California state law. (Doc.

9   28.) After completing discovery, the parties filed cross-motions for summary judgment on

10  the issue of whether the '502 and '075 Marks are invalid because they are generic.

11                              **STANDARD OF REVIEW**

12  "The court shall grant summary judgment if the movant shows that there is no genuine

13  dispute as to any material fact and the movant is entitled to judgment as a matter of law."

14  Fed. R. Civ. P. 56(a). "[T]he substantive law will identify which facts are material[;] [o]nly

15  disputes over facts that might affect the outcome of the suit under the governing law will

16  properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477

17  U.S. 242, 248 (1986). "One of the principal purposes of the summary judgment rule is to

18  isolate and dispose of factually unsupported claims or defenses." Celotex Corp. v. Catrett,

19  477 U.S. 317, 323-24 (1986) (further quotation omitted).

20  The movant bears the initial burden of proving the absence of a genuine issue of

21  material fact. Id. at 323. For issues on which the movant would bear the burden of proof at

22  trial, the initial summary judgment burden is met by marshaling the evidence to foreclose the

23  possibility that a reasonable jury could find for the non-movant. Adickes v. S. H. Kress &

24

25  _____

    [3] Although Plaintiffs object to facts concerning the UDRP proceeding on the basis of

26  relevance, "[e]vidence which is essentially background in nature can scarcely be said to

    involve disputed matter, yet it is universally offered and admitted as an aid to

27  understanding." Fed. R. Evid. 401 advisory committee notes (1972). Plaintiffs' hearsay

    objection fails because the evidence could be presented in admissible form at trial. See Fed.

28  R. Civ. P. 56(c).

1   Co., 398 U.S. 144, 157-58 (1970). Where the non-movant would bear the burden of proof
2   at trial, the movant may carry its initial burden by proving the absence of evidence to support
3   the non-movant's case. Celotex, 477 U.S. at 325. If the movant carries its initial burden, the
4   non-movant must designate "significantly probative" evidence capable of supporting a
5   favorable verdict. Anderson, 477 U.S. at 249-50.

6       In determining whether either or both of these burdens have been carried, "[t]he
7   evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn
8   in [that party's] favor." Anderson, 477 U.S. at 254; see Narayan v. EGL, Inc., 616 F.3d 895,
9   899 (9th Cir. 2010) (explaining an inference is justifiable if it is rational or reasonable).
10  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate
11  inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for
12  summary judgment." Anderson, 477 U.S. at 255.

13                                  **ANALYSIS**

14      Plaintiffs contend the GOOGLE mark has become generic because a majority of the
15  public understands the word google, when used as a verb, to mean the indiscriminate act of
16  searching on the internet without regard to the search engine used. Underlying Plaintiffs'
17  argument is the proposition that verbs, as a matter of law, are incapable of distinguishing one
18  service from another, and can only refer to a category of services. Defendant contends there
19  is no admissible evidence capable of supporting a finding that a significant portion, let alone
20  a majority, of the consuming public does not principally understand the GOOGLE mark to
21  identify a distinct product, regardless of how the mark is employed grammatically.

22      In ruling on Plaintiffs' motion, the Court accepts as true Defendant's admissible
23  evidence and draws all reasonable inferences in Defendant's favor; in ruling on Defendant's
24  motion, the Court accepts as true Plaintiffs' admissible evidence and draws all reasonable
25  inferences in Plaintiffs' favor. The Court first resolves the chief legal disagreement between
26  the parties (whether verb use of a mark necessarily renders the mark generic) and the
27  admissibility of expert evidence before proceeding to the ultimate issue of whether either
28  party is entitled to summary judgment on whether the GOOGLE mark has become generic.

1    **I.      Grammatical Function and Genericness**

2          A mark is subject to cancellation if it "becomes the generic name for the goods or

3    services, or a portion thereof, for which it is registered." 15 U.S.C. § 1064(3); accord Park

4    'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194 (1985). "The primary significance

5    of the registered mark to the relevant public . . . shall be the test for determining whether the

6    registered mark has become the generic name of goods or services on or in connection with

7    which it has been used." 15 U.S.C. § 1064(3). Under the primary-significance test, a mark

8    is not generic when "the primary significance of the term in the minds of the consuming

9    public is not the product but the producer." Kellogg Co. v. National Biscuit Co., 305 U.S.

10   111, 118 (1938); see Bayer Co. v. United Drug Co., 272 F. 505, 509 (S.D.N.Y. 1921) ("What

11   do the buyers understand by the word for whose use the parties are contending?"). "[I]f the

12   primary significance of the trademark is to describe the *type of product* rather than the

13   *producer*, the trademark is a generic term and cannot be a valid trademark." Rudolph Int'l,

14   Inc. v. Realys, Inc., 482 F.3d 1195, 1198 (9th Cir. 2007) (quoting Filipino Yellow Pages, Inc.

15   v. Asian Journal Publ'ns, Inc., 198 F.3d 1143, 1147 (9th Cir. 1999)).

16         The crux of Plaintiffs' argument is the premise "a trademark ceases to function as

17   such when it is used primarily as a verb." (Doc. 111 at 2) (emphasis omitted). This premise

18   is flawed: a trademark performs its statutory function so long as it distinguishes a product or

19   service from those of others and indicates the product's or service's source. See 15 U.S.C.

20   § 1127. Verb use of a trademark is not fundamentally incapable of identifying a producer or

21   denoting source. A mark can be used as a verb in a discriminate sense so as to refer to an

22   activity with a particular product or service, *e.g.*, "I will PHOTOSHOP the image" could mean

23   the act of manipulating an image by using the trademarked Photoshop graphics editing

24   software developed and sold by Adobe Systems. This discriminate mark-as-verb usage

25   clearly performs the statutory source-denoting function of a trademark.

26         However, a mark can also be used as a verb in an indiscriminate sense so as to refer

27   to a category of activity in general, *e.g.*, "I will PHOTOSHOP the image" could be understood

28   to mean image manipulation by using graphics editing software other than Adobe Photoshop.

This use commandeers PHOTOSHOP to refer to something besides Adobe's trademarked product. Such indiscriminate mark-as-verb usage does not perform the statutory trademark function; instead, it functions as a synecdoche describing both a particular species of activity (*e.g.* using Adobe's PHOTOSHOP brand software) and the genus of services to which the species belongs (*e.g.* using image manipulation software in general).

It cannot be understated that a mark is not rendered generic merely because the mark serves a synecdochian "dual function" of identifying a particular species of service while at the same time indicating the genus of services to which the species belongs. S. Rep. No. 98-627,[4] at 5 (1984), <u>reprinted in</u> 1984 U.S.C.C.A.N. 5718, 5722 (explaining "dual function" use "is not conclusive of whether the mark is generic"); <u>accord</u> 15 U.S.C. § 1064(3) ("A registered mark shall not be deemed to be the generic name of goods or services solely because such mark is also used as a name of or to identify a unique product or service."). Nor is a mark "generic merely because it has *some significance* to the public as an indication of the nature or class of an article. . . . In order to become generic the *principal significance* of the word must be its indication of the nature or class of an article, rather than an indication of its origin." <u>Feathercombs, Inc. v. Solo Prods. Corp.</u>, 306 F.2d 251, 256 (2d Cir. 1962) (emphasis added). Moreover, "casual, non-purchasing uses of [marks] are not evidence of generic usage" because primary significance is determined by " 'the use and understanding of the [mark] in the context of purchasing decisions.' " 2 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> § 12:8 (4th ed. 2014) (quoting <u>Restatement (Third) of Unfair Competition</u> § 15 cmt. c (1995)) [hereinafter "<u>McCarthy</u>"].

"The salient question is the primary significance of the term to the consumer. If the term indicates a product of a single producer to the consumer, it is a valid trademark." S. Rep. No. 98-627, at 5, <u>reprinted in</u> 1984 U.S.C.C.A.N. 5718, 5722. Thus, even if a mark *qua* verb is used exclusively in the indiscriminate sense, the mark is **not** generic if a majority of

---

[4] Report of the Senate Committee on the Judiciary regarding the Trademark Clarification Act of 1984, Pub. L. No. 98-620, §§ 102-03, 98 Stat. 3335, which adopted the primary-significance test by amending Sections 14(c) and 45 of the Lanham Act.

the consuming public nevertheless uses the mark *qua* mark to differentiate between one particular product or service from those offered by competitors.

A genericism inquiry guided by grammatical formalism is incompatible with the intent of the Lanham Act and its subsequent amendment by the Trademark Clarification Act. The twofold justification for the Lanham Act as stated by the Senate Committee on Patents was: (1) "to protect the public so it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get"; and (2) "where the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats." S. Rep. 1333, at 1 (1946), reprinted in 1946 U.S. Code & Cong. Serv. 1274, 1274.

The benefits derived from protecting trademarks include fostering market competition by enabling a consumer to distinguish competing articles from each other; and encouraging quality by "securing to the producer the benefit of the good reputation which excellence creates." Id. at 2, reprinted in 1946 U.S. Code & Cong. Serv. 1274, 1273. The same was true nearly 40 years later: "Because of their importance to our nation's commerce, trademarks long have been protected from appropriation and misuse by others, both to protect the consumer from deception and confusion and to insure that producers are rewarded for their investment in the manufacture and marketing of their product." S. Rep. No. 98-627, at 2, reprinted in 1984 U.S.C.C.A.N. 5718, 5719.

It is thus contrary to both the letter and spirit of trademark law to strip a mark of legal protection solely because the mark—cultivated by diligent marketing, enforcement, and quality control—has become so strong and widespread that the public adopts the mark to describe that act of using the class of products or services to which the mark belongs. As one scholar has stated, "top-of-mind use of a trademark in its verb form, far from indicating the mark's generic status, may well indicate the enduring fame of the brand." Laura A. Heymann, The Grammar of Trademarks, 14 Lewis & Clark L. Rev. 1313, 1348 (2010). This is especially true where the mark in question is arbitrary or fanciful because such terms had

1  a different or no independent meaning before they were adopted as marks. See Fortune
2  Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc., 618 F.3d 1025, 1032-33 (9th
3  Cir. 2010) (explaining the strongest end of the trademark spectrum as arbitrary marks, which
4  are "actual words with no connection to the product," and fanciful marks, which are
5  "made-up words with no discernable meaning").

6       Plaintiffs' argument that courts have already recognized a "dichotomy between verb
7  usage and trademark usage" and that "[v]erb usage is therefore generic usage," is
8  unsupported. (Doc. 73 at 6, 8.) Plaintiffs cite two non-precedential TTAB cases denying
9  initial registration of marks that sought to combine two common words ("tree" and "radar"
10 for treeradar and "grind" and "brew" for "grind 'n brew") because the marks were
11 conceptually weak (generic/descriptive).[5] See In re Grindmaster Corp., No. 77834762, 2011
12 WL 5600317, at *4 (TTAB Oct. 28, 2011) (noting the putative mark was merely equivalent
13 to the concatenation of two verbs); In re TreeRadar, Inc., No. 77579817, 2011 WL 3212252,
14 at *7 (TTAB July 15, 2011) (noting claimed trademark use and recognition was ambiguous
15 partly because applicant used the putative mark as a generic verb "in one instance").
16 Plaintiffs also cite Freecyclesunnyvale v. Freecycle Network, Inc., No. C 06–00324 CW,
17 2006 WL 2827916, at *3 (N.D. Cal. Oct. 3, 2006), which held allegations of intentionally
18 encouraging others to use an unregistered mark generically as part of an effort to render the
19 mark generic and unregistrable were sufficient to state a cognizable claim for contributory
20 infringement. Inasmuch as these cases are apposite and support the proposition that mark-as-
21 verb use renders a previously distinctive mark generic, the Court finds them unpersuasive.
22 If the primary significance of such a mark to a majority of the consuming public is to
23 differentiate one service from the services of others, then the mark is not generic. This is true
24 regardless of whether the public also uses the mark as an indiscriminate verb.

25      Plaintiffs' reliance on a procrustean grammatical standard is misplaced. The
26 dispositive inquiry is whether a majority of the consuming public considers the primary

27 _____

28     [5] See Fortune Dynamic, 618 F.3d at 1032-33.

- 8 -

1   significance of the mark to be an indication of origin rather than an indication of nature and

2   class. See Coca-Cola Co. v. Overland, Inc., 692 F.2d 1250, 1254 n.10 (9th Cir. 1982);

3   King-Seeley Thermos Co. v. Aladdin Indus., Inc., 321 F.2d 577, 580-81 (2d Cir. 1963). "The

4   primary significance test does not, in and of itself, tell us how to differentiate a mere product

5   brand from a product genus. . . . Once that question is decided, the resulting question often

6   decides itself." A.J. Canfield Co. v. Honickman, 808 F.2d 291, 301 (3d Cir. 1986).[6] In this

7   case, the relevant issue is whether the primary significance of the GOOGLE mark to a majority

8   of the public who performs searches on the internet understands the mark to refer to the

9   Google search engine as opposed to a descriptive term for search engines in general.

10  **II.    Expert Opinion Evidence**

11          In the Ninth Circuit, "expert opinion is admissible and may defeat summary judgment

12  if it appears the affiant is competent to give an expert opinion and the factual basis for the

13  opinion is stated in the affidavit." Walton v. United States Marshals Serv., 492 F.3d 998,

14  1008 (9th Cir. 2007) (alteration omitted) (quoting Bulthuis v. Rexall Corp., 789 F.2d 1315,

15  1318 (9th Cir. 1985) (per curiam)). To be admissible, an expert's testimony must be relevant

16  and have "a reliable basis in the knowledge and experience of [the relevant] discipline."

17  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 149 (1999). "Expert opinion testimony

18  is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And

19  it is reliable if the knowledge underlying it has a reliable basis in the knowledge and

20  experience of the relevant discipline." Primiano v. Cook, 598 F.3d 558, 565 (9th Cir. 2010)

21

---

22          [6] "If some people regard the contested designation as a generic name, while others
23  regard it as a mark, the term must be placed either in the 'generic' pigeonhole or in the
    'trademark' category." 2 McCarthy § 12:6. Some scholars have criticized this as a false
24  dichotomy because trademarks "can perform a variety of informational functions—ranging
    from the provision of pure commercial or source-related information to the provision of pure
25  generic or product-category information—at the same time." Ralph H. Folsom & Larry L.
    Teply, Trademarked Generic Words, 89 Yale L.J. 1323, 1339 (1980). "A better approach to
26  this problem would be to recognize that a finding of one primary significance may not be
27  possible: in other words, that the hybrid character of many trademarked words may create
    pluralities or coextensive majorities." Id. at 1351.
28

(citations and internal quotation marks omitted).

"In a case involving scientific evidence, evidentiary reliability [is] based upon scientific validity." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 590 n.9 (1993) (emphasis omitted). Scientific validity concerns the soundness of methodology rather than the correctness of conclusions. Estate of Barabin v. AstenJohnson, Inc., 740 F.3d 457, 463 (9th Cir. 2014) (en banc). "The reliability inquiry is 'a flexible one,' " id. (quoting Kumho Tire, 526 U.S. at 150), that considers whether the expert's testimony "is based on sufficient facts or data" and "is the product of reliable principles and methods," and whether the expert "reliably applied the principles and methods to the facts of the case," Fed. R. Evid. 702.

Both parties object to each others' expert reports regarding the primary significance of the GOOGLE mark in the minds of the consuming public.

### A.      Defendant's Expert Linguist

Defendant's expert linguist, Dr. Geoffrey Nunberg, opined about a linguistic phenomenon observed in some "highly distinctive and famous marks" where "the name of a particular product is used to convey the genus without actually denoting it." (Doc. 72-1 at 5.) Dr. Nunberg's expert report explains:

> Trademarks are sometimes used in extended or figurative ways to denote something independent of their proprietary meaning (cf Astroturf for political movements, Band-Aid for social remedies). In a special case of this process, trademarks may be used as verbs to denote the characteristic action associated with the product or service they represent. Examples include TiVo, Fed-Ex, Skype, and Google. Such verbs may be specific in their application . . . [b]ut such verbs may [also] be used in a representative way to connote a more general action. Thus when somebody says, "I need the book tomorrow—can you Fed Ex it to me?" we ordinarily assume that a shipment by UPS will be acceptable as well, without assuming that the verb to Fed-Ex simply means to ship by priority courier.

(Id. at 5-6.) Accordingly, Dr. Nunberg asserts that the use of the word google as a nonspecific verb does not compromise the status of the GOOGLE mark because it literally denotes the use of Google's search engine. (Id. at 5-7.) Consistent with his report, Dr. Nunberg opined that the GOOGLE mark has not become generic and that the phrase "go google it" is not necessarily shorthand for "look it up on the internet." (Doc. 70-9 at 3-4.)

Plaintiffs attack Dr. Nunberg as a "hired gun who will say anything he is paid to say"

1   because he allegedly "reversed his opinion." (Doc. 86 at 12.) While inconsistencies may be

2   an indicator of reliability, see Daubert, 509 U.S. at 590 n.9, Plaintiffs do not substantiate their

3   allegation that Dr. Nunberg reversed his opinion. The fact that Dr. Nunberg first expressed

4   interest in being retained by Plaintiffs before being subsequently retained by Defendant does

5   not necessarily mean Dr. Nunberg gave inconsistent professional opinions. To the contrary,

6   the only evidence in the record is Dr. Nunberg's testimony that Plaintiffs never retained,

7   paid, or shared any confidential or work product information with him, that he never shared

8   any of Plaintiffs' information with Defendant, and that while he may have shared ideas with

9   Plaintiffs, the only expert opinion he rendered was the one contained in his report. (Doc. 113-

10  3 at 3-5.)

11      Plaintiffs' unsubstantiated allegation of inconsistent opinions can be addressed on

12  cross-examination. Plaintiffs' other objection, that the Dr. Nunberg's "opinions are

13  conclusions on the ultimate issues" (Doc 86 at 12), is misplaced. See Fed. R. Evid. 704(a)

14  ("An opinion is not objectionable just because it embraces an ultimate issue."). As there is

15  no serious contention that Dr. Nunberg lacked sufficient data, utilized unsound methods, or

16  applied those methods unreliably, Dr. Nunberg's opinion is admissible.

17          **B.    Defendant's Consumer Survey Expert**

18      Defendant's survey expert, Dr. Gerald Ford, conducted a consumer survey modeled

19  after the one used in E. I. DuPont de Nemours & Co. v. Yoshida Int'l, Inc., 393 F. Supp. 502

20  (E.D.N.Y. 1975), to prove that the primary significance of the TEFLON mark in the minds of

21  consumers was DuPont's non-stick coating, rather than non-stick coatings in general. In Dr.

22  Ford's "Teflon" survey, 420 randomly selected participants were contacted via telephone and

23  were asked whether "Hewlett Packard" and "computer" were brands names or common

24  names. (Doc. 70-7 at 8-9.) All 420 respondents successfully identified "Hewlett Packard" as

25  a brand name and "computer" as a common name. (Id.)

26      The respondents were then asked to identify six names (STP; Coke; Jello; refrigerator;

27  margarine; aspirin) as either brand names or common names and were told that "don't know"

28  or "no opinion" was an acceptable answer. (Id. at 8-9.) They were not told that "both" was

an acceptable answer, but answers of "both" were nevertheless recorded. (Id. at 9.) The respondents were subsequently asked to apply the brand name/common name distinction to another five names (browser; website; Amazon; Yahoo; Google) specifically with respect to searching on the internet. (Id.) Last, the respondents were asked whether they conducted searches on the internet—respondents who did not were excluded from the results. (Id.)

Excluding 19 respondents who answered they do not perform searches on the internet, 93.77% identified GOOGLE as a brand name and 5.25% identified GOOGLE as a common name. (Id. at 12.) For purposes of comparison, 93.52% of consumers identified the YAHOO! mark as a brand name while 5.99% identified YAHOO! as a common name. (Id.) Both GOOGLE and YAHOO! beat out COKE: 89.53% of consumers identified the COKE mark as a brand name while 6.73% identified COKE as a common name. (Id. at 11.) The only mark with higher brand name recognition or lower common name misrecognition than GOOGLE was the AMAZON mark at 96.51% and 2.99%, respectively. (Id. at 12.) Even accounting for the 19 respondents who claimed they did not perform searches on the internet, the results "are projectable to all members of the defined universe at a 95% level of confidence with an estimated error of +/- 2.37%." (Id. n.8.)

Plaintiffs' sole objection is that the study is irrelevant because it does not account for verb usage, which is generic usage. (Doc. 86 at 9.) In support, Plaintiffs cite the Ninth Circuit's criticism and rejection of Teflon style surveys in Anti-Monopoly, Inc. v. General Mills Fun Group, 684 F.2d 1316, 1323-24 (9th Cir. 1982). However, Congress passed the Trademark Clarification Act of 1984, Pub. L. No. 98-620, 98 Stat. 3335, for the express purpose of "overturn[ing] the reasoning in" and "rectif[ying] the confusion generated by Anti-Monopoly." S. Rep. No. 98-627, at 8, reprinted in 1984 U.S.C.C.A.N. 5718, 5725. In particular, Congress sought to "clarify that a mark may have a 'dual purpose' of identifying goods and services and indicating the source of the goods and services." Id.

Plaintiffs object that Dr. Ford's survey is irrelevant because it "does not even address the verb issue" and "tests only whether the word 'google' when used as a noun, is a proprietary name or common name." (Doc. 73 at 21) (emphasis omitted). Expert evidence

is "relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." Primiano, 598 F.3d 558, 565 (quoting United States v. Sandoval-Mendoza, 472 F.3d 645, 654 (9th Cir. 2006)). The pertinent inquiry here is whether the primary significance of the GOOGLE mark to a majority of the consuming public (those who utilize internet search engines) is to indicate the Google search engine in particular or to indicate the common descriptive term for search engines in general. Dr. Ford's survey is evidence that the significance of the GOOGLE mark "with respect to searching the internet" to an overwhelming majority of the consuming public (93.77%) is a particular brand name rather than a common name like "website" (identified as such by 97.76% of respondents). (Doc. 70-7 at 11-12.) Therefore, Dr. Ford's survey is relevant.

### C.  Plaintiffs' Counsel's Surveys

Plaintiffs' counsel, Richard Wirtz, designed and executed surveys using "Google Consumer Surveys" that asked respondents to select one of three answers to the prompt: "I most often use the word google to mean." (Docs. 75-16; 75-17.) The 1,033 responses for the first survey were: "to search something on the internet" (52.2%); "the name of a specific search engine" (28.7%); and "the internet (in general) (19.1%)." (Doc. 75-16.) The 1,007 responses for the second survey were "to search something on the internet" (72%); "the name of a company" (11.5%); and "the internet (in general)" (16.6%). (Doc. 75-17.) Plaintiffs cite these surveys as evidence that a majority of the consuming public predominantly uses the word "google" as an indiscriminate verb meaning to search on the internet. (Doc. 84 ¶ 23.)

Defendant's objection is that these surveys, and others designed and executed by Mr. Wirtz,[7] are inadmissible because they are irrelevant, unreliable, and that Mr. Wirtz is not qualified to render an opinion about the meaning of such surveys. (Docs. 78 at 6 n.3; 83 at 8.) Defendant argues that the Wirtz's surveys are fundamentally flawed because they did not

---

[7] The additional surveys asked similar questions (e.g. "What does Google primarily mean to you"; "what is a synonym for search engine"; and "what does 'google it' mean"), and were not submitted as separate exhibits. Rather, they were included only as part of Plaintiffs' consumer survey expert's report. (See Doc. 99-1 at 9-10, 54-69.)

1    permit respondents to answer that the word google meant "to search for information using
2    the Google search engine." (Doc. 83 at 9.) Defendant further argues that the fact that Mr.
3    Wirtz represents Plaintiffs renders the Wirtz surveys inadmissible. (Id.)

4        To be admissible, a survey must be "conducted in accordance with generally accepted
5    survey principles." Federal Judicial Center, Reference Manual on Scientific Evidence 364
6    (3d ed. 2011) [hereinafter "FJC, Scientific Evidence"]; see Fed. R. Evid. 703. "An
7    assessment of the precision of sample estimates and an evaluation of the sources and
8    magnitude of likely bias are required to distinguish methods that are acceptable from
9    methods that are not." FJC, Scientific Evidence at 364 n.16. Thus, the survey expert "must
10   demonstrate an understanding of foundational, current, and best practices in survey
11   methodology, including sampling, instrument design . . . , and statistical analysis." Id. at 375.

12       Generally, valid survey design requires "graduate training in psychology (especially
13   social, cognitive, or consumer psychology), sociology, political science, marketing,
14   communication sciences, statistics, or a related discipline," but "professional experience in
15   teaching or conducting and publishing survey research may provide the requisite
16   background." Id. While counsel may be "involved in designing the questions to be asked, .
17   . . it may be improper for an attorney to single handedly design a survey without professional
18   assistance." 6 McCarthy § 32:166. An expert who seeks to opine about the results of a survey
19   that he or she did not personally conduct still must possess the requisite scientific background
20   and familiarity with survey methodology. FJC, Scientific Evidence at 375-76.

21       There is no evidence the Wirtz surveys were conducted according to generally
22   accepted principles. While Plaintiffs submitted demographic data for two Wirtz surveys
23   (Doc. 111-2), there is no explanation of the methods of statistical analysis. Even if the
24   statistical methods were included, there is no evidence regarding their reliability. Moreover,
25   Mr. Wirtz does not have, nor does he claim to have, adequate training to design a survey or
26   to interpret survey results. Neither Plaintiffs' nor Defendant's survey experts opined about
27   the methodological validity of the Wirtz surveys. In fact, as explained below, Plaintiffs'
28   survey expert expressly disclaimed any knowledge about the design or execution of the Wirtz

1   surveys. Dr. Nunberg, who is qualified to opine about designing survey questions about the
2   meanings of words, testified that he thought the two main Wirtz surveys were "worthless"
3   because asking "what does X mean to you" is "the vaguest possible question you can ask"
4   and because the possible responses did not allow respondents to answer that the word
5   "google" meant "to use the Google search engine." (Doc. 85-2 at 3.)

6       Contrary to Plaintiffs' argument that the Wirtz surveys are "court complaint" because
7   Mr. Wirtz "did no more than any other attorney working with a human surveyor to design
8   an appropriate survey question," Plaintiffs are seeking to qualify "Google Consumer
9   Surveys" as an expert in survey design and Mr. Wirtz as an expert in survey interpretation.
10  (Doc. 111 at 1, 6.) It is not clear whether the purported expert statistical analysis comes from
11  "Google Consumer Surveys," Mr. Wirtz, or both. If an actual expert had been provided with
12  the methodological information necessary to opine about survey results, the expert could
13  have opined that the Wirtz surveys "test[ed] whether majority usage of 'google' is as a verb
14  or as a source indicator." (Id.) However, such information is absent from the record and no
15  expert so opined. Because neither the Wirtz surveys themselves nor the opinions Mr. Wirtz
16  draws therefrom meet the threshold standard of reliability required by Federal Rules of
17  Evidence, they are inadmissible. E.g., Hodgdon Powder Co., Inc. v. Alliant Techsystems,
18  Inc., 512 F. Supp. 2d 1178 (D. Kan. 2007) (excluding survey partly because "[n]othing in the
19  record suggests that plaintiff's counsel has any experience with designing or conducting
20  market surveys"). Even if the surveys were admissible, their introduction at trial would
21  require the testimony of Mr. Wirtz, which would preclude him from acting as an advocate.
22  See Ariz. R. Sup. Ct. 42, ER 3.7; LRCiv 83.2(e).

23      **D.    Plaintiffs' Consumer Survey Expert**

24      Plaintiffs' consumer survey expert, James Berger, conducted a substantially modified
25  version of the survey used in Am. Thermos Prods. Co. v. Aladdin Industries, Inc., 207 F.
26  Supp. 9 (D. Conn. 1962), aff'd, 321 F.2d 577 (2d Cir. 1963), to prove that the word thermos
27  had become the common descriptive name for vacuum bottles. The purpose of Mr. Berger's
28  "Thermos" survey was to test "if people who access the internet at least once a week regard

1    GOOGLE in its verb form to be generic rather than a brand name." (Doc. 99-1 at 6.) Mr.

2    Berger opined that while the Teflon protocol is more commonly used, the "Thermos"

3    protocol was selected because it allowed testing of the verb form of a mark. (Id. at 7.)

4         In Mr. Berger's Thermos survey, 251 respondents were asked a series of screening

5    questions before they were asked: "If you were going to ask a friend to search for something

6    on the Internet, what word or phrase would you use to tell him/her what you want him/her

7    to do?" (Id. at 8.) Slightly over half of the validated respondents' answers (129 of them)

8    contained the word google. (Id. at 9-10.) Mr. Berger opined that the survey results "proved

9    beyond any doubt that the primary significance [sic] 'google' to the relevant public when

10   used as a verb is generic and commonly used to mean search on the internet." (Id. at 9, 11.)

11        Defendant objects to the objectivity, reliability, and relevance of Mr. Berger's survey.

12   Mr. Berger testified in his deposition that the survey was designed to prove something that

13   Plaintiffs wanted to prove. (Doc. 70-8 at 5.) Further, Mr. Berger testified that his survey did

14   nothing to test whether consumers understand that the GOOGLE mark *qua* mark refers to one

15   company (id. at 6), and that it was not important to ask respondents about their understanding

16   of the word google (id. at 9). In fact, Mr. Berger stated that his survey tested neither the

17   primary significance of the term Google to consumers nor whether the term was generic with

18   respect to search engine hardware and software that are the subject of the '502 and '075

19   Marks. (Id. at 10-12.) While Mr. Berger was aware that Thermos style surveys ordinarily ask

20   several questions, his survey asked only one substantive question. (Id. at 7.) Mr. Berger

21   conceded that he was not aware of any other Thermos style survey in which only one

22   substantive question was posed, nor was he aware of a court ever accepting such a survey.

23   (Id. at 7-8.) Moreover, Mr. Berger testified that he was not aware of any treatises or articles

24   that endorse the use of a single substantive question Thermos style survey. (Id. at 10.)

25        Mr. Berger noted the results of his survey were similar to the results of the Wirtz

26   surveys. (Id. at 8, 13-15.) Defendant objects to the reliability of the Wirtz surveys referenced

27   in Mr. Berger's report. An expert who seeks to opine about the results of a survey that he or

28   she did not personally conduct should demonstrate familiarity with the survey methodology

1  including target population, sampling design, and survey design, as well as rates and patterns

2  of missing data and statistical analyses used to interpret results. FJC, <u>Scientific Evidence</u> at

3  375-76. As explained above, information about the methodology and statistical analyses of

4  the Wirtz surveys is absent from the record—Mr. Berger did not claim to know such

5  information nor was it included in his report.

6        It is undisputed that the Wirtz surveys were conducted before Mr. Berger was retained

7  as an expert and that he was not involved in any way and had no knowledge about the

8  developing or execution of those surveys. (Doc. 70-8 at 13-15.) Mr. Berger further testified

9  that he "reviewed the questions that were included in the surveys . . . only in the context of

10  putting them in his report." (<u>Id.</u> at 15.) Mr. Berger did not testify that such surveys are the

11  type of evidence that consumer survey experts ordinarily rely upon.

12        The Court finds that Mr. Berger's expert opinion partially admissible. Mr. Berger

13  lacked sufficient methodological familiarity with the Wirtz surveys to reliably opine about

14  their meaning and did not claim that the Wirtz surveys were methodologically reliable. To

15  the extent that Mr. Berger opines about the results of the Wirtz surveys, his opinion is

16  inadmissible. However, Mr. Berger designed, conducted, and interpreted a survey that

17  provides him with data to opine about whether and how the word google is used as a verb.

18  That there is no authority endorsing or accepting his one-substantive-question Thermos style

19  survey pushes the boundaries of reliability, but not past the threshold of inadmissible "junk

20  science." Thus, Mr. Berger's opinion that a majority of the public uses the word google as

21  a verb to mean search on the internet, and only that opinion, is admissible. It bears repeating,

22  however, that this is not the dispositive issue. The dispositive issue is whether the primary

23  significance of the GOOGLE mark to a majority of the consuming public is an indication of

24  the Google search engine—a matter that Mr. Berger is not qualified to opine upon.

25  **III.   Primary Significance of the Google Mark to the Consuming Public**

26        "A party moving for summary judgment is entitled to the benefit of any relevant

27  presumptions that support the motion." <u>Coca-Cola Co.</u>, 692 F.2d at 1254. "Federal

28  registration of a trademark endows it with a strong presumption of validity. The general

1    presumption of validity resulting from federal registration includes the specific presumption

2    that the trademark is not generic." <u>KP Permanent Make-Up, Inc. v. Lasting Impression I,</u>

3    <u>Inc.</u>, 408 F.3d 596, 604 (9th Cir. 2005) (quoting <u>Overland, Inc.</u>, 692 F.2d at 1254). It is

4    undisputed that both the '502 and '075 marks are registered and incontestable pursuant to 15

5    U.S.C. §§ 1058, 1065.

6         While Plaintiffs' dispute the validity of these registrations on the basis they are

7    generic, the fact that the marks are indeed registered means that Plaintiffs bear the burden of

8    proving at trial that the marks are generic. <u>See</u> <u>Filipino Yellow Pages</u>, 198 F.3d at 1146. A

9    second consequence of the registrations is that Defendant "has met its [initial] burden of

10   demonstrating that the genericness of the trademark [GOOGLE] does not raise a genuine issue

11   of material fact." <u>Overland, Inc.</u>, 692 F.2d at 1254. Thus, to survive Defendant's motion,

12   Plaintiffs must designate specific facts from which a jury could find that the GOOGLE mark

13   is generic. <u>See</u> <u>id.</u> If Plaintiffs cannot come forward with such evidence even when given the

14   benefit of the doubt, then Plaintiffs necessarily cannot satisfy the more demanding standard

15   of showing that the evidence, when viewed most favorably to Defendant, cannot support a

16   finding that the Google mark is not generic.

17        There are various forms of evidence that courts have found relevant to the primary

18   significance inquiry, including: dictionary usage; mark-holder usage; competitor usage;

19   media usage; and consumer surveys.[8] <u>See</u> 2 <u>McCarthy</u> § 12:13 to :14. Contrary to Plaintiffs'

20   inflexible insistence on framing the matter as grammatical logomachy, whether the GOOGLE

21   _____

22        [8] "The central inadequacy of the primary-significance test is that it is essentially
     binary in nature: it is premised on the assumption that a word must function discontinuously
23   either as a trademark or as a product-category word." Folsom & Teply, <u>supra</u> note 6, at
     1339. "If each consumer has a trade name awareness that lies somewhere on the continuum
24   between total product class significance and total source distinguishing significance, then
     genericide evaluation should attempt to determine the degree to the side of the midpoint on
25   which each consumer lies." Lee B. Burgunder, <u>An Economic Approach to Trademark</u>
26   <u>Genericism</u>, 23 Am. Bus. L.J. 391, 406 (1985). No doubt, surveys could be constructed that
     would be more probative than are the Teflon and Thermos protocols regarding the *primary*
27   significance of a word to a majority of the consuming public. <u>See</u> <u>supra</u> note 6.
28

mark is generic depends on whether its primary significance to a majority of the public is a designation of the Google search engine or a designation of search engines in general. Thus, Plaintiffs' many relevancy objections are misplaced: evidence is relevant if it has any tendency to make a fact of consequence in determining the public's understanding of the GOOGLE mark more or less probable. See Fed. R. Evid. 401.

As to dictionary usage, Plaintiffs are unable to cite to a single dictionary whose definition of the word "google" neglects to mention the trademark significance of the term. Plaintiffs accuse Defendant of "intimidat[ing] [dictionaries] into submission" (Doc. 86 at 1), because Defendant enforces its mark. For example, Defendant asked the website wordspy.com to modify its definition of google as a discriminate verb ("To search for information on the Web, particularly by using the Google search engine") to "take into account the trademark status of Google." (Doc. 87 ¶ 96.) Likewise, Plaintiffs contend that the Merriam-Webster dictionary "tempered its definition of google as a result of its fear of Defendant" because the publisher stated "we were trying to be as respectful as we possibly could be about Google's trademark." (Doc. 87 ¶ 105.) Plaintiffs also cite the opinions of both of their expert linguists in support of the proposition that the inclusion of a word in dictionaries means that the word carries generic usage. (Id. ¶¶ 100-01.) It is undisputed that both of Plaintiffs' linguistic experts testified the GOOGLE mark serves to identify Google as the provider of its search engine services. (Docs. 68 ¶¶ 70-71; 87 ¶¶ 70-71.) Viewing the evidence[9] in the light most favorable to Plaintiffs, it establishes the word google carries meaning as an indiscriminate verb.

Shifting to mark-holder usage, Plaintiffs emphasize that Google co-founder Larry Page stated on July 8, 1998, "Have fun and keep googling." (Doc. 84 ¶ 2.) Plaintiffs also cite to the fact that entering the search query "define: google" into the Google search engine resulted in a verb definition of: "Use an internet search engine, particularly google.com."

---

[9] Plaintiffs' assertions that dictionaries have been "intimidated into submission" and temper their definitions "out of [their] fear of Defendant" are scurrilous attacks unsupported by admissible evidence.

1    (Doc. 70-5.)   Plaintiffs argue that non-enforcement of a mark suggests it is generic (Doc. 86

2    at 11) and point to the fact that the GOOGLE mark is used in other domain names that

3    Plaintiffs did not purchase (Doc. 73 at 19). However, it is undisputed that: Defendant uses

4    the GOOGLE mark to identify the Google search engine in national advertising campaigns;

5    has policies in place that set strict standards for third party use of the mark; publishes rules

6    and guidelines for use of the mark; and spends sizeable sums policing and enforcing its rights

7    in the mark. (Docs. 68 ¶¶ 75-80; 87 ¶¶ 75-80.) While it is true that non-enforcement of a

8    mark may be evidence the mark is generic, the undisputed facts make it unreasonable to infer

9    that Defendant does not enforce its rights in the mark.

10         Plaintiffs' alternative argument is that Defendant's enforcement expenditures are "so

11    proportionately low" to the estimated valuation of the GOOGLE mark (over $113 billion) that

12    "it constitutes abandonment of the mark." (Id.) Plaintiffs cite no authority in support of this

13    proposition and the Court is aware of none. Plaintiffs' theory would diminish the economic

14    value of a mark to the mark-holder by inflating enforcement costs according to some

15    arbitrary fraction of mark valuation. See William M. Landes & Richard A. Posner,

16    Trademark Law: An Economic Perspective, 30 J.L. & Econ. 265, 295 (1987). Such a result

17    is inconsistent with federal trademark law's goals of facilitating commerce by permitting

18    consumers to make purchasing decisions based on mark-recognition and securing to mark-

19    holders the benefits appurtenant to marks associated with quality products and services. The

20    Court declines to countenance Plaintiffs' theory that failure to spend some fraction of

21    estimated mark valuation in enforcement of the mark means the mark is generic. Thus, as

22    with dictionary usage, mark-holder usage establishes at most that google-as-verb is

23    sometimes used in the indiscriminate sense.

24         Moving next to how competitors use the mark, Plaintiffs provide no evidence that

25    competitors use the GOOGLE mark in a non-trademark fashion. Plaintiffs assert that lack of

26    competitors' use of the mark is irrelevant and that "[t]here is no doubt that they refrain from

27    doing so for fear of the wrath of Defendant." (Doc. 86 at 16.) In support, Plaintiffs cite a

28    footnote from the Second Circuit's decision in Murphy Door Bed Co., Inc. v. Interior Sleep

1   Sys., Inc., 874 F.2d 95, 101 n.2 (2d Cir. 1989), which noted competitors' non-use is not

2   independently sufficient to prove non-genericness because enforcement of the mark might

3   deter use. However, Murphy Door Bed Co. also acknowledged that competitors' non-use of

4   a mark is nonetheless evidence the mark is not generic. Id. The Court agrees that non-use of

5   a mark by competitors is indeed probative of genericism, albeit peripherally.

6           If competitors can accurately describe their products or services without using the

7   mark in question, it suggests the mark is not generic. E.g., Salton Inc. v. Cornwall Corp., 477

8   F. Supp. 975, 986 (D. N.J. 1979) (considering whether being unable to use a mark to describe

9   products substantially disadvantaged competitors). A corollary of this point is that the

10  existence of a short and simple descriptive term for the genus to which the trademarked

11  species belongs also evidences the mark in question as not generic. E.g., Q-Tips, Inc. v.

12  Johnson & Johnson, 108 F. Supp. 845, 863 (1952) (distinguishing the trademarked product

13  "Q-Tips" from the descriptive term for the type of goods "double tipped applicator"). In this

14  case, "internet search engines" is the short and simple descriptive term for the genus to which

15  the Google search engine belongs. It is undisputed that competing search engine providers

16  Yahoo! and Microsoft Bing routinely distinguish their search engine services from Google's

17  search engine service in press releases and advertising campaigns. (Docs. 68 ¶¶ 66-69; 87

18  ¶¶ 66-69.) Thus, there is no evidence of competitors' usage capable of supporting the

19  inference that the word google has become the common descriptive term for the category of

20  services to which the Google search engine belongs: internet search engines.

21          As to media use, Plaintiffs contend that the media often uses the word google as an

22  indiscriminate verb. Some of Plaintiffs' purported evidence of indiscriminate verb use is

23  inadmissible because it was not timely disclosed.[7] As Defendant points out, some of

24

25          [7] Pursuant to Federal Rule of Civil Procedure 26(a)(3)(A)(iii), a party is required to

26  provide the opposing party "an identification of each document or other exhibit" that the

27  proponent "may present at trial." "If a party fails to provide information . . . as required by

    Rule 26(a) . . . , the party is not allowed to use that information . . . to supply evidence on a

28  motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

1    Plaintiffs' media evidence recognizes the trademark significance of the GOOGLE mark and

2    that Plaintiffs have not designated a single instance in which a major media outlet has

3    referred to a competing search engine as a "google." Plaintiffs' media evidence consists

4    mostly of verb usage, some of which is followed by recognition of trademark usage. (Doc.

5    84 ¶¶ 11-17.) Like Plaintiffs' other evidence, the media's use of the word google establishes

6    that it is sometimes used as verb to mean search on the internet.

7        Last, Plaintiffs' consumer survey evidence, consistent with all the other relevant

8    evidence, is that the word google is indeed used as a verb. Mr. Berger's survey quantifies the

9    proportion of society that understands google as a verb as 51%. While Mr. Berger's survey

10   did not test whether this majority understood google-as-verb in a discriminate or

11   indiscriminate sense, Mr. Berger's opinion allows the inference that a majority of the

12   consuming public understands the word google—when used as a verb—to refer to the

13   indiscriminate act of searching on the internet. However, the fact that a majority of the public

14   understands a trademark as an indiscriminate verb is not dispositive on whether the mark is

15   generic. The dispositive question is whether "the *primary significance* of the trademark is to

16   describe the *type of product* rather than the *producer*." Rudolph Int'l,, 482 F.3d at 1198 (first

17   emphasis added) (quoting Filipino Yellow Pages, 198 F.3d at 1147). It is undisputed that Mr.

18   Berger's survey did not test the primary significance of the word google and the Court has

19   found Mr. Berger is not qualified to opine about matter. Therefore, Plaintiffs present no

20

21   _____

22   Fed. R. Civ. P. 37(c)(1). This sanction is "self-executing" and "automatic" so as to "provide[]
     a strong inducement for disclosure of material that the disclosing party would expect to use
23   as evidence, whether at a trial, at a hearing, or on a motion, such as one under Rule 56." Id.
     advisory committee notes (1993).
24        Defendant objected that some of Plaintiffs' media evidence was not disclosed. (Doc.
25   112 at 8.) "The burden is on the proponent to show that the material is admissible as
     presented or to explain the admissible form that is anticipated" at trial. Fed. R. Civ. P.
26   56(c)(2) advisory committee notes (2010). Plaintiffs did not respond to Defendant's objection
     and it is not self-evident that the evidence is harmless or that its non-disclosure was
27   substantially justified. The Court will not consider the untimely evidence. (Doc. 87 ¶¶ 91-
28   94).

1   evidence that the primary significance of the word google to a majority of the consuming

2   public is a common descriptive term for search engines.

3       *Summary*

4       The Court is mindful that "summary judgment is generally disfavored in the trademark

5   arena" due to "the intensely factual nature of trademark disputes." Rudolph Int'l., 482 F.3d

6   at 1199 n.3 (quoting KP Permanent Make-Up, Inc., 408 F.3d at 602). However, summary

7   judgment is nevertheless appropriate when there is no genuine issue of material fact. Id. at

8   1199. Such is the case here.

9       The existence of a primary significance implies the existence of, at least, a secondary

10  significance; depending on the trademarked term, there may also be tertiary and quaternary

11  meanings. Congress has spoken with particular clarity and force on the issue of whether a

12  registered trademark is subject to cancellation as generic because it has more than one

13  significance: "A registered mark shall not be deemed to be the generic name of goods or

14  services solely because such mark is also used as a name of or to identify a unique product

15  or service." 15 U.S.C. § 1064(3). Therefore, as a matter of law, a mark is not generic only

16  because it simultaneously signifies more than just the trademarked product.

17      The word google has four possible meanings in this case: (1) a trademark designating

18  the Google search engine; (2) a verb referring to the act of searching on the internet using the

19  Google search engine; (3) a verb referring to the act of searching on the internet using *any*

20  search engine; and (4) a common descriptive term for search engines in general. The '502

21  and '075 marks are subject to cancellation *only* if the fourth meaning is the *primary*

22  significance of the word google to a majority of the consuming public.

23      Accepting Plaintiffs' evidence as true, 51% of those who utilize internet search

24  engines use the word google as a verb to mean search on the internet. This establishes that

25  the second and third meanings exist. Drawing all reasonable inferences in Plaintiffs' favor,

26  a majority of the consuming public uses google-as-verb in its indiscriminate sense to mean

27  search on the internet without regard to the search engine used. This means that the third

28  meaning is more significant than the second meaning. Plaintiffs then make the leap, without

1    any competent evidence, that the third meaning is the is the most *frequently* used meaning
2    and seek cancellation of the '502 and '075 Marks because of the frequency with which the
3    word google is used as a verb. This argument is factually and legally flawed. Factually,
4    Plaintiffs offer no competent evidence in support of their assertion that verb use is more
5    frequent than non-verb use. Legally, the test for whether a mark has become generic is not
6    whether its most frequent use is as an indiscriminate verb, but whether its primary
7    significance to a majority of the consuming public is as a common descriptive term. Even if
8    the most frequent use of the word google is its third meaning, Plaintiffs' argument
9    nevertheless fails because there is no evidence to suggest that the primary significance of the
10   word google is the fourth meaning *because* the third meaning is most frequently used.

11          Plaintiffs' claim for trademark cancellation disappears when the admissible evidence
12   in the record is examined according to the laws enacted by Congress. It is undisputed that
13   well over 90% of the consuming public understands the word google with respect to
14   searching on the internet as designating not to a common name, but a particular brand. (Doc.
15   68 ¶ 41.) This fact establishes that the first meaning (a trademark designating the Google
16   search engine) is more significant than is the fourth meaning (a common descriptive term for
17   search engines in general) to a vast majority of the consuming public. Therefore, the '502 and
18   '075 marks are **not** subject to cancellation. This is true even though the Court accepts as true
19   that the 51% of the public also understands the third meaning (a verb referring to the act of
20   searching on the internet using *any* search engine)—it is undisputed that the first and third
21   meanings are not mutually exclusive and, in fact, coexist. (Id. ¶¶ 70-71.)

22          For the cancellation claim to survive summary judgment, Plaintiffs needed to submit
23   significantly probative evidence that the primary significance of the word google to a
24   majority of the consuming public was a common descriptive term for search engines.
25   Plaintiffs, at their peril, neglected their burden of proof under the primary significance test,
26   instead electing to present evidence about whether a majority of the consuming public
27   understood the word google as a verb. Disregarding primary significance resulted in an
28   absolute failure of proof that is fatal to Plaintiffs' claim for genericide. The Court declines

1    Plaintiffs' invitation to judicially legislate federal trademark law out its "dark ages" by side-

2    stepping the statutory test for primary significance and holding that frequency of verb use is

3    in and of itself sufficient to render a mark generic. (Doc. 111 at 1.)

4        Likewise, the Court declines to depart from settled Ninth Circuit jurisprudence

5    holding that "[t]he question of genericness is often answered by reference to the 'who-are-

6    you/what-are-you' test: a valid trademark answers the former question, whereas a generic

7    product name or adjective answers the latter." Rudolph Int'l,, 482 F.3d at 1198. The

8    undisputed evidence is that the consuming public overwhelmingly understands the word

9    google to identify a particular search engine, not to describe search engines in general.

10       "[T]he record taken as a whole could not lead a rational trier of fact to find" that the

11   primary significance of the word Google is not an indicator of the Google search engine but

12   is an indicator of internet search engines in general. Matsushita Elec. Indus. Co. v. Zenith

13   Radio Corp., 475 U.S. 574, 587 (1986). The fact that a bare majority of the consuming public

14   also uses the word google as a generic verb to mean search on the internet does nothing

15   "more than simply show that there is some metaphysical doubt as to the material facts." Id.

16   Plaintiffs cannot supplant the primary-significance test with a frequency-of-verb-use test to

17   cancel the GOOGLE mark, which they admit refers to "one of the largest, most recognized,

18   and widely used Internet search services in the world." (Docs. 68 ¶ 2; 87 ¶ 2.)

19                                    **CONCLUSION**

20       Accepting Plaintiffs' evidence as true and drawing all justifiable inferences therefrom

21   in Plaintiffs' favor, a majority of the public uses the word google as a verb to refer to

22   searching on the internet without regard to search engine used. Giving Plaintiffs every

23   reasonable benefit, majority of the public uses google-as-verb to refer to the act of searching

24   on the internet and uses GOOGLE-as-mark to refer to Defendant's search engine. However,

25   there is no genuine dispute about whether, with respect to searching on the internet, the

26   primary significance of the word google to a majority of the public who utilize internet

27   search engines is a designation of the Google search engine. Therefore, Defendant is entitled

28   to judgment as a matter of law that the '075 and '502 Marks are not generic.

Accordingly,

**IT IS HEREBY ORDERED denying** Plaintiffs' motion for summary judgment. (Doc. 73.)

**IT IS FURTHER ORDERED granting** Defendant's motion for summary judgment. (Docs. 67; 78.)

**IT IS FURTHER ORDERED** that the Court will subsequently issue the Order Setting Final Pretrial Conference.

DATED this 10th day of September, 2014.

Stephen M. McNamee
Senior United States District Judge